## United States District Court
## District of Massachusetts

|  |  |  |
|---|---|---|
| VWI TOWERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 18-10345-NMG |
| TOWN OF NORTH ANDOVER PLANNING | ) | |
| BOARD, JOHN SIMONS, PETER | ) | |
| BOYNTON, JENNIFER LUZ, EITAN | ) | |
| GOLDBERG, AARON PRESTON, | ) | |
| CHRISTINE ALLEN and TOWN OF | ) | |
| NORTH ANDOVER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM & ORDER

GORTON, J.

This case arises out of the denial of a special permit for the construction and operation of a wireless communication facility by VWI Towers, LLC ("Varsity" or "plaintiff") to be located at a site in the Town of North Andover.  Varsity brings this action against the Town of North Andover Planning Board ("the Planning Board"), individual members thereof and the Town of North Andover (collectively "the Town" or "defendants"), alleging that they have violated the Telecommunications Act of 1996, 47 U.S.C. § 332 ("the TCA").

Plaintiff alleges that 1) the Planning Board's written decision denying the permit application is not supported by

substantial evidence contained in the written record as required by § 332(c)(7)(B)(iii) (Count I) and 2) the denial of the permit effectively prohibits the provision of personal wireless services in violation of § 332(c)(7)(B)(i)(II) (Count II). Plaintiff seeks the annulment of the Planning Board's decision denying its permit application and the issuance of a permanent injunction ordering the Town to issue all necessary permits for the immediate construction and installation of the proposed facility.

Before this Court is plaintiff's motion for summary judgment. For the following reasons, that motion will be allowed, in part, and denied, in part.

I. **Background**

A. **The Coverage Gap and the Proposed Facility**

Varsity develops communications facilities for the deployment of personal wireless services. It leases its facilities to telecommunications providers who install their own equipment to provide service to a particular geographic area. Cellco Partnership, doing business as Verizon Wireless ("Verizon"), and New Cingular Wireless PCS, LLC ("AT&T") are telecommunication providers licensed with the Federal Communications Commission to provide personal wireless services in the Commonwealth of Massachusetts, including the Town of North Andover.

In order for a telecommunications carrier to provide an effective wireless communications system, it must maintain a network of cell sites with slightly overlapping coverage areas. Cell sites are typically comprised of a base station and a cell tower with mounted antennae and other electronic communications equipment.  Those cell sites must be overlapping to allow users to move freely through a geographic area without losing service. They need to be constructed at a sufficient height as defined by various factors, such as location, coverage of existing cell sites, terrain, land use characteristics and population density.

Verizon and AT&T are continuously building their networks of cell sites to provide reliable service through current "4G LTE" technology while also planning for future needs and demands.  Consistent with that goal, Verizon and AT&T have identified a gap in their coverage within the Town of North Andover in the area comprising Foster Street, Salem Street, Boxford Street, Bridges Lane, Vest Way and surrounding roads and neighborhoods ("the Coverage Objective").

Verizon hired a radio frequency expert to analyze the existing wireless communications network coverage and needs in the Coverage Objective using radio frequency propagation maps and drive test data.  He determined that there were over 1,000 residents in the affected area receiving inadequate service from Verizon.  Moreover, the expert estimated that the Coverage

Objective experienced a significant amount of traffic with Salem Street serving approximately 9,600 vehicles per day east of Appleton Street and 2,900 vehicles per day south of Boxford Street.[1]  AT&T is estimated to have a nearly identical area of deficient coverage and approximately 1,300 customers in the Coverage Objective area who lack adequate service.

In August, 2017, Varsity applied to the Planning Board for a special permit and site plan review for the installation and operation of a proposed facility located at 122 Foster Street in North Andover ("the Proposed Facility").  It also applied separately to the Town of North Andover Zoning Board ("the Zoning Board") for a series of variances needed to construct the Proposed Facility.  The Proposed Facility would consist of a 130-foot-tall cell tower camouflaged as a pine tree ("the monopine" or "the tower"), faux pine branches that extended five feet above the tower to a height of 135 feet, a compound of nearly 4,000 square feet surrounded by a six-foot-high wooden stockade fence, an ice bridge, a back-up generator, a pad-mounted transformer and other communications equipment.  Verizon and AT&T agreed to enter into separate leases with Varsity whereby they would co-locate their antennas on the monopine.

---

[1] Those traffic estimates are based on data from the Massachusetts Department of Transportation from 2016.

Along with its application, Varsity submitted the report of Verizon's radio frequency expert and several documents demonstrating its site selection process.  Those documents included a spreadsheet of 19 alternative properties Varsity reviewed and rejected as a location for the Proposed Facility with the reasons for their rejection.  The report also explained that so-called "macro sites" (such as the Proposed Facility) are the more common solution for larger areas of wireless service coverage but that those sites can be supplemented by so-called "small cells" which generally consist of smaller antenna mounted on existing utility poles, light poles or short rooftops and are designed to service discrete areas rather than broad coverage gaps.  The expert concluded that the use of only small cells would be inadequate to provide the desired level of service to the Coverage Objective.

**B.   The Relevant Bylaw**

In assessing Varsity's application for a special permit, the Planning Board considered the following relevant provisions of the North Andover Zoning Bylaw ("the Bylaw"), among others. Section 8.9(1) of the Bylaw provides that its express purpose is

> to minimize the visual and environmental impacts as well as any potential deleterious impact on property value, of wireless service facilities located within the Town or adjacent thereto.

> Pursuant to Section 8.9(3)(a)(i) of the Bylaw,

-5-

> [t]he carrier must demonstrate that the facility is
> necessary in order to provide adequate service to the
> public.

Under Section 8.9(3)(b)(i), wireless service facilities are to be located on pre-existing structures if feasible, such as existing buildings, telecommunications facilities, utility poles and towers or related facilities.

In accordance with Section 8.9(3)(b)(ii), the wireless facility must be camouflaged to the greatest extent possible if it is not going to be located on a pre-existing structure and under Section 8.9(4)(a)(II), the facility must be surrounded by a buffer of dense trees or vegetation to provide a year-round visual buffer.  Section 8.9(4)(d) provides that:

> (i)[n]o facility shall be located within 300 feet of a
> Scenic Road and
> (ii)[w]ireless service facilities shall not be located
> within open areas that are visible from public roads,
> recreational areas or residential development.

Finally, under Section 10.31(1) of the Bylaw,

> [t]he Special Permit Granting Authority shall not
> approve any such application for a Special permit
> unless it finds that in its judgment all the following
> conditions are met: [(1)] [t]he specific site is an
> appropriate location for such a use, structure or
> condition; [(2)] [t]he use as developed will not
> adversely affect the neighborhood; [(3)] [t]here will
> be no nuisance or serious hazard to vehicles or
> pedestrians; [(4)] [a]dequate and appropriate
> facilities will be provided for the proper operation
> of the proposed use; . . . [and (5)] [it] make[s] a
> specific finding that the use is in harmony with the
> general purpose and intent of this Bylaw.

**C.    The Hearing Process, the Town's Expert Reports and the Board's Decision**

Between September, 2017, and January, 2018, the Planning Board held five public hearings at which Varsity's application for a special permit was discussed.  At those hearings, representatives of Varsity presented their analysis with respect to the Coverage Objective and the impact of the Proposed Facility.  Numerous residents testified regarding the visual impact of the Proposed Facility on the historic landscape, including the farm on which the Proposed Facility was to be located.  They pointed out the adverse visual impact on the community soccer fields near the Proposed Facility and the likely negative impact on the property values of surrounding residences.  Several residents testified that there was already adequate wireless coverage in their area, abutters to the proposed property submitted a petition signed by 21 residents who opposed the tower and two direct abutters submitted a letter requesting that the Proposed Facility be built on a different location farther back on the proposed site.

In response to those concerns, Varsity agreed to reduce the height of the proposed tower to 110 feet (115 feet to the top of the fake branches) and conducted expert studies of both the visual impact of the Proposed Facility at the modified height

and its possible effect on residential property values.[2]  Varsity
presented photographs to the Planning Board which demonstrated
that, while the tower would be visible year-round from several
locations (including the community soccer fields and several
residences), it was minimally visible from many locations and
not visible at all from most others.  Furthermore, Varsity's
real estate consultants concluded that the Proposed Facility
would have no measurable impact on surrounding property values.

In addition to the testimony and materials submitted by
Varsity and residents, the Planning Board also considered
analysis conducted by its own consultant, David Maxson
("Maxson").  He concluded, based on his own radio frequency
propagation maps, that there was a gap in coverage generally in
the geographic area identified by Verizon and AT&T and that
placing a facility somewhere in that area would improve the
service to the covered residences.  He also agreed that 1) there
did not appear to be any existing structures where Verizon and
AT&T could co-locate and which was capable of providing the
desired coverage, 2) both Verizon and AT&T would require a
minimum tower height of 97 feet in order to provide adequate
coverage and 3) both carriers could not locate their antennas at
the same height on the tower.

---

[2] The visual impact studies consisted of floating a red balloon at the
simulated height of the proposed tower and taking photographs from various
locations in the surrounding neighborhood to assess its visibility.

Moreover, Maxson agreed with Varsity that the use of "Cloud Radio Access Nodes" ("C-RANs") alone, which are a type of small cell site, would be unable to satisfy the desired service to the Coverage Objective. He explained that C-RANs could provide service to portions of Salem Street and Boxford Street where there are existing utility poles on which the devices could be mounted but that a new macro site would be needed to provide coverage to many other streets and residences in the Coverage Objective which lacked existing utility poles and would likely oppose the erection of new utility poles. He explained that Verizon, but not AT&T, currently deploys C-RANs in North Andover and thus the use of C-RANs alone would not be a feasible alternative for the gap in AT&T's coverage.

Maxson confirmed that at least eight of the sites considered and rejected by Varsity were indeed unavailable because they were conservation land but nevertheless concluded that there were other feasible alternative sites which would provide comparable or superior service coverage to the subject area. He identified a purportedly superior site at 409 Foster Street ("Parcel 28") based upon the fact that there was already a power substation located on the property and it was farther east and thus would provide more coverage to residents than the Proposed Facility.

Maxson disagreed with Varsity's conclusion that Parcels 28 and 29 were too far east to provide the desired service to the Coverage Objective.  He expressed the opinion that the alternative of placing a tower at the top of Bruin Hill (north of Foster Street) would require a right of way over Town-owned land for access but would provide the best overall improvement in coverage to residents.  Maxson did not conduct an analysis of the availability or constructability of the Bruin Hill site or verify its visual impact.  All of the alternative parcels of land are owned by National Grid.

Another alternative identified by Maxson was a location farther back on the proposed property.  That site would require the tower to be slightly taller but would be potentially less visible to the street and neighbors because of denser tree coverage.  He also suggested locating the tower on the parcel of land adjacent to the proposed property which was owned by the same landowner but did not conduct an analysis of the accessibility, availability or visual impact of a tower on either of those parcels.

Maxson noted that there were several other possible alternatives on Town-designated open space, including two sites close to the community soccer fields.  He acknowledged, however, that he had not conducted specific coverage analysis with respect to those sites or determined whether they were actually

available for use, suitable for construction, accessible or
would have a better or worse visual impact than the Proposed
Facility.  Furthermore, Maxson explained that, while the use of
"open space" for wireless facilities was not expressly
prohibited by the Bylaw, he was unsure whether the Town
nevertheless restricted the use of open space for such
facilities.  He also noted that because those open spaces are
Town-owned parcels, they are subject to a public hearing process
in order to make them available for leasing which he considered
to be "a time-consuming process with uncertain outcome".
Furthermore, he explained that location on Town-designated open
spaces

> may do more to mar the scenery than the proposed
> facility . . . [and] [f]urther analysis would be
> needed to vet them for visual impact.

To rebut Maxson's conclusions that there are feasible
alternative sites available, Varsity submitted a letter from
National Grid in which the company notified Varsity that it
would not enter a lease agreement for commercial development on
Parcels 28 and 29.  Furthermore, Varsity submitted the meeting
minutes from the public hearing held in December, 2017, in which
the Planning Board, Varsity representatives, Maxson and
residents discussed the problems of access over Bruin Hill,
including the need to cross over Town-owned property and
possible conservation restrictions.

-11-

Varsity submitted an affidavit of Steven Young, the owner of the proposed property, in which he contends that he discussed with Varsity various potential locations on his property for the Proposed Facility but refused to lease any portion of his property or his adjacent property other than that specifically identified in Varsity's application for a special permit.  With respect to one of the proposed alternative sites identified by Maxson, Varsity submitted a letter from the owner of that property voicing his opposition to the Proposed Facility. Finally, Varsity notes that, with respect to the Town-owned open spaces, Maxson has not identified whether they are actually available for lease and has not considered the visual impact of a tower on those sites (especially as to the proposed locations having an unobstructed view of the community soccer fields).

### D.   The Decisions of the Zoning Board and the Planning Board

On January 3, 2018, the Zoning Board of Appeals granted Varsity's application for the necessary variances to construct the Facility at the proposed location.  It determined that no pre-existing structures, alternative technologies or reasonably feasible alternative locations for a proposed tower existed to provide the desired coverage.  It also found that the reduced tower height of 115 feet (inclusive of the fake branches) was the minimum height necessary to provide adequate service to the

Coverage Objective.  The Zoning Board of Appeals determined that denying the requested variances for the Proposed Facility would effectively prohibit the provision of adequate wireless service to the subject area.  It concluded that the granting of the requested variances would not deviate from the intent or purpose of the Bylaw but rather would serve the public good by providing enhanced wireless service while, to the extent feasible, minimizing the visual impact of the Facility through camouflage, buffers and reduced height.

Despite the findings and conclusions of the Zoning Board of Appeals, the Planning Board voted unanimously on January 16, 2018, to deny Varsity's application for a special permit.  The Planning Board offered essentially five reasons for denying the permit: 1) Varsity failed specifically to define the exact boundaries of the alleged area of inadequate coverage; 2) it failed to demonstrate that the alleged gap in coverage was "significant"; 3) it has not shown that the Proposed Facility is necessary to provide adequate service to the public because feasible alternatives exist, including location at possibly less objectionable sites or the use of C-RANs on certain streets; 4) it failed to minimize the significant, undesirable visual impact of the Proposed Facility on the surrounding neighborhood and landscape, including on the nearby soccer fields and "the agricultural landscape and scenic views"; and 5) it provided

insufficient evidence of the effect of the Proposed Facility on property values.

The Planning Board conceded that a gap in adequate coverage existed in the subject area but stated that its exact bounds were "subject to interpretation and open to refinement".  It explicitly found, however, that the gap generally existed near Foster Street, Winter Street and connecting neighborhoods and that a number of residences would be served by the Proposed Facility.  It also found that the gap existed in small sections of Salem Street and Boxford Street but that the Proposed Facility was not necessary to provide coverage to those areas because of the existence of C-RANs that could be mounted on existing utility poles along those streets.

The Planning Board determined that no existing utility structures were adequate to provide the desired service but concluded that there were reasonable alternatives to the Proposed Facility which could provide substantially similar levels of service.  The Planning Board's decision did not specify which of the other site locations was a feasible alternative but noted that it was reasonable to assume that the owner of the property for the Proposed Facility would be open to discussing alternative locations on his property.  It also stated that Varsity had not evaluated the potential visual impact of other sites farther away from the proposed location.

-14-

The Planning Board found that, while the Proposed Facility would be camouflaged as a pine tree, it would not be surrounded by sufficient trees and vegetation to provide an adequate, year-round visual buffer.  The Planning Board determined that the Proposed Facility was not near a designated Scenic Road but that, nevertheless, the proposed location's history and current state of development "creates a scenic experience for passersby".  The Planning Board concluded that the Proposed Facility would adversely affect the neighborhood and surrounding landscape and was therefore not in harmony with the general purpose and intent of the Bylaw.

### E.   Procedural History

In February, 2018, Varsity filed this action against the Town.  In June, 2019, it filed a motion for summary judgment on the grounds that 1) the Planning Board's decision is not supported by substantial evidence as required by § 332(c)(7)(B)(iii) of the TCA and 2) its denial of the special permit effectively prohibits Varsity from providing personal wireless services in violation of § 332(c)(7)(B)(i)(II) of the TCA.

Specifically, Varsity contends that defendants 1) improperly rejected expert evidence concerning the significant coverage gaps experienced by Verizon and AT&T, 2) required Varsity to define the exact boundaries of inadequate coverage

-15-

and to demonstrate no feasible alternatives neither of which is expressly required by the Bylaw, 3) incorrectly determined that feasible alternatives to the Proposed Facility exist, 4) incorrectly determined that the gap in coverage can be addressed solely by C-RAN or other small cell devices, 5) improperly concluded that the Proposed Facility would reduce property values without any evidentiary support and 6) improperly relied upon general aesthetic concerns in denying the special permit.  Moreover, plaintiff asserts that the Planning Board's decision effectively prohibits the provision of wireless services because 1) it materially inhibits the provision of such services, 2) a significant gap in coverage exists in the subject area and 3) no feasible alternatives exist to address that gap in coverage.

Defendants respond that the Bylaw requires the carrier to demonstrate that the Proposed Facility is necessary to provide adequate service to the public and thus it was appropriate for the Planning Board to consider feasible alternatives.  Moreover, defendants contend that: 1) the testimony from residents with respect to the visual impact of the Proposed Facility on the landscape and its possible effect on property values was substantial evidence in support of the Planning Board's decision, 2) Varsity failed to prove there was a significant gap in coverage or there were no feasible alternatives to the

Proposed Facility and therefore 3) Varsity did not establish an effective prohibition to the provision of wireless service.

Defendants submit that even if the Court ultimately concludes that the Planning Board's decision is unsupported by substantial evidence or effectively prohibits the provision of wireless service, the proper relief is to remand the case to the Planning Board for further proceedings rather than to enter an injunction ordering it to grant the special permit.

## II.  **Motions for Summary Judgment**

### A.  **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact

in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

### B.   The TCA

The purpose of the TCA is to facilitate the national development of wireless telephone service.  The Act, "an exercise in cooperative federalism", delegates authority over the placement and construction of facilities to state and local authority. Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 21-22 (1st Cir. 2002).  That authority, however, is subject to five limitations enumerated in 47 U.S.C. § 332(c)(7)(B).  Two of those limitations are relevant here.

First, the TCA provides that any decision of a local board denying a request to place or construct personal wireless

services facilities "shall be in writing and supported by
substantial evidence contained in a written record".
§ 332(c)(7)(B)(iii).  A district court's review of a board's
decision is not de novo. ATC Realty, LLC v. Town of Kingston,
303 F.3d 91, 95 (1st Cir. 2002).  The burden of proving that the
record contains substantial evidence rests with the party
seeking approval. Green Mountain Realty Corp. v. Leonard, 688
F.3d 40, 50 (1st Cir. 2012).  "Substantial evidence is such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion." Nat'l Tower, 297 F.3d at 22 (internal
citation and quotation omitted).  When recording its decision,
the board need not present "formal findings of fact or
conclusions of law" or "state every [supporting] fact in the
record." Id. at 20-21.  At a minimum,

> [a] written denial must contain a sufficient explanation
> of the reasons for the denial to allow a reviewing court
> to evaluate the evidence in the record supporting those
> reasons.

Id. (internal quotation omitted).

The Court's review is confined to the record before the
local board, ATC Realty, 303 F.3d at 95, and must take into
account evidence that supports and contradicts the board's
conclusions. Cellco P'ship v. Town of Grafton, 336 F. Supp. 2d
71, 79 (D. Mass. 2004).  While a local board must evaluate an
application for a permit or variance under the standard provided

by state and local law, <u>American Towers</u> v. <u>Shrewsbury</u>, Civil Action No. 17-10642-FDS, 2018 WL 3104105, at *8 (D. Mass. June 22, 2018), a mere recitation of provisions of state and local zoning law does not constitute "substantial evidence" under the TCA. <u>See</u> <u>T-Mobile Ne. LLC</u> v. <u>City of Lawrence</u>, 755 F. Supp. 2d 286, 291 (D. Mass. 2010); <u>Sprint Spectrum L.P.</u> v. <u>Town of Swansea</u>, 574 F. Supp. 2d 227, 236 (D. Mass. 2008). However, if the evidence permits inconsistent conclusions, the court will defer to the decision of the local authority, "provided the local board picks between reasonable inferences from the record before it." <u>Nat'l Tower</u>, 297 F.3d at 23.

Second, the decision "shall not prohibit or have the effect of prohibiting the provision of personal wireless services". 47 U.S.C. § 332(c)(7)(B)(i)(II). Even when there is substantial evidence to support a local authority's decision under the applicable state and local law, the decision can still constitute an effective prohibition in violation of the TCA. <u>Nat'l Tower</u>, 297 F.3d at 20.

Citing a relatively recent FCC Declaratory Ruling, plaintiff contends that the appropriate standard under the effective prohibition provision is to determine whether the decision materially inhibits the provision of wireless services, including the carrier's ability to introduce new services or otherwise improve existing services. <u>See</u> <u>In re Accelerating</u>

<u>Wireless Broadband Deployment by Removing Barriers to</u>
<u>Infrastructure Investment</u>, 33 FCC Rcd. 9088, 9104-05 (2018).

The First Circuit Court of Appeals has, however, applied a seemingly more stringent test to effective prohibition claims involving an individual denial of a permit.  First, the court determines whether there is a "significant gap in coverage" in the subject area. <u>Green Mountain</u>, 688 F.3d at 57.  Factors to consider in determining whether a given gap in coverage is "significant" are 1) the "physical size of the gap", 2) "the area in which there is a gap", 3) "the number of users the gap affects", 4) "whether all of the carrier's users in that area are similarly affected by the gaps" and 5) "data about percentages of unsuccessful calls or inadequate service during calls in the gap area". <u>Omnipotent Holdings, Inc.</u> v. <u>City of Cranston</u>, 586 F.3d 38, 49 (1st Cir. 2009).  Second, the court must consider whether feasible alternatives to the carrier's proposed solution exist such that there is no effective prohibition. <u>Green Mountain</u>, 688 F.3d at 57.  Whether a decision constitutes an effective prohibition is a case-by-case determination and the plaintiff must

> show from language or circumstances not just that <u>this</u>
> application has been rejected but that further
> reasonable efforts are so likely to be fruitless that
> it is a waste of time even to try.

Id. at 58 (citing Town of Amherst v. Omnipotent Commc'ns Enters., Inc., 173 F.3d 9, (1st Cir. 1999) (describing the plaintiff's burden of proof as "a heavy one")).  While the carrier has the initial burden of conducting a systematic study of alternative sites and demonstrating that no feasible alternatives exist, once it has done so the local board must either show that the plaintiff's evidence was factually insufficient or come forward with evidence of its own to demonstrate a genuine dispute of fact. See Indus. Tower & Wireless, LLC v. Haddad, 109 F. Supp. 3d 284, 303-04 (D. Mass. 2015).

Unlike the review under a substantial evidence challenge, the court reviews any determinations of whether a decision constitutes an effective prohibition de novo and may rely on evidence outside of the administrative record compiled by the local board. Id.

### C.   Application

#### 1.   Substantial Evidence

The Planning Board erred in relying upon Varsity's failure specifically to define the boundaries of the alleged area of inadequate coverage as a reason to deny the special permit. Nothing in the Bylaw requires that a carrier specifically define the exact boundaries of the area of intended coverage in applying for such a permit. See T-Mobile Ne. LLC v. City of

Lowell, Civil Action No. 11-11551-NMG, 2012 WL 6681890, at *9 (D. Mass. Nov. 27, 2012) (holding that the local board failed to act on the basis of substantial evidence when it relied upon a criterion not provided for in the local ordinance).

Moreover, the Board erred in relying on the use of C-RANs as a feasible alternative to the Proposed Facility because that conclusion was directly contradicted by unrebutted evidence in the record, including the reports submitted by both its own consultant and Varsity's consultant. See id. (finding that a local board's decision was based on unsubstantiated opinions or conclusions and thus not supported by substantial evidence). A few generalized concerns from residents about the potential decrease in property values is also not substantial evidence in support of the Planning Board's decision in light of the contradictory expert testimony submitted by Varsity's real estate consultant. See Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 496 (2d Cir. 1999).

The Court does find, however, that there was substantial evidence in the record for the Planning Board to deny Varsity's application on the basis of the Proposed Facility's visual impact on the surrounding landscape. While mere general aesthetic concerns do not constitute substantial evidence in support of the denial of a permit, particularized aesthetic concerns grounded in the specifics of the case can support a

-23-

local authority's decision.  Green Mountain, 688 F.3d at 53.
Here, the Bylaw specifically provides that the Planning Board
must consider the visual impact of any proposed wireless
communication facility on the surrounding neighborhood.  Many of
the aesthetic concerns expressed by local residents were
complaints about the generally unappealing nature of the
Proposed Facility.  Other residents spoke specifically, however,
about the adverse visual impact that the tower would have on the
historic farm and scenic landscape, as well as to the fact that
the tower was visible year-round from the community soccer
fields.  While a close question, those aesthetic concerns are
sufficiently particularized to the specific facts of this case
to support the Planning Board's decision.

Plaintiff's motion for summary judgment with respect to
Count I will therefore be denied.

Varsity is wrong to suggest that the Planning Board was not
permitted to consider whether there was a significant gap in
coverage and whether there were feasible alternatives to the
Proposed Facility in assessing the application for a special
permit.  The Bylaw specifically provides that the Planning Board
must consider whether the Proposed Facility is necessary to
provide adequate service to the public.  It is reasonable that
in assessing whether a facility is necessary, the Planning Board
would consider the substantiality of the alleged coverage gap

-24-

and possible alternatives that are less intrusive.  The Court
need not determine, however, whether there was substantial
evidence to support the Planning Board's decision on that basis
because it nevertheless concludes that, based on all the
evidence now before it, the Planning Board's denial of the
special permit effectively prohibits the provision of wireless
services in the Coverage Objective area.

### 2. Effective Prohibition

While there was substantial evidence to support the
Planning Board's decision based on specific aesthetic concerns,
its decision constitutes an effective prohibition in violation
of the TCA.  Because the Court finds that Varsity has
established an effective prohibition even under the First
Circuit's more demanding "significant gap" test, it declines to
decide whether the appropriate standard under the TCA is the
FCC-endorsed "materially inhibit" test.

First, Varsity has demonstrated that there is a significant
gap in service with respect to both Verizon and AT&T.  Varsity's
expert consultant has identified over 2,000 new residents who
would be served in the Coverage Objective by Verizon and AT&T.
Neither defendants nor their expert, Maxson, appear to contest
those figures.  Indeed, Maxson admits in his report that the
Proposed Facility would provide improved service to many new
residents.  Furthermore, data provided by Varsity shows that

approximately 12,000 vehicles travel along Salem Street each day. The Coverage Objective is sufficiently large and serves a substantially high number of residents to constitute a significant gap.

Second, Varsity has carried its burden of demonstrating that it has conducted a systematic analysis of various locations throughout the Town and that the only feasible alternative is the Proposed Facility. While Maxson has proposed various alternatives, there are several reasons to reject those proposed sites as feasible. With respect to Parcels 28 and 29, Varsity has presented a letter from National Grid confirming that it is unwilling to lease that property for a wireless communication facility. It also submitted an affidavit of the current landowner of the site for the Proposed Facility in which he asserts that he is unwilling to lease any other portion of that property or his adjacent property for a communications facility. Finally, Varsity demonstrated that at least one other alternative site was owned by a resident who opposed the original project and thus there was no reason to believe that he would consent to the construction of a facility on his own property. Those sites are therefore unavailable and not feasible alternatives.

With respect to Bruin Hill, Maxson conceded that it has substantial access problems because Varsity would have to obtain

a right of way over Town-owned land.  Given the Planning Board's apparent hostility to the tower and the need to obtain access over Town property, it is unlikely that Bruin Hill is a feasible alternative.  See Nextel Commc'ns of the Mid-Atl., Inc. v. Town of Wayland, 231 F. Supp. 2d 396, 408-09 (D. Mass. 2002).  The Planning Board has demonstrated its hostility to a proposed tower by relying, in part, on ambiguous and unsupported reasons to deny Varsity's application.  See American Towers, 2018 WL 3104105, at *13.  Those reasons include the Planning Board's conclusions that 1) Varsity provided insufficient evidence of the impact of the tower on property values despite the report of the real estate consultant, 2) C-RANs were a feasible alternative despite the report of its own expert to the contrary and 3) there were other feasible locations available without specifying to which properties it was referring.

Similarly, there is no reason to believe that the Town is willing to lease designated open space, such as the property identified near the community soccer fields, for a wireless communication facility.  Maxson acknowledged that it is unclear whether those open spaces are restricted from such use and that even if they are technically available, the Town must still vote to approve any lease of those properties.  As noted above, it seems unlikely that the Town would be willing to lease those

properties in light of the opposition of both the Planning Board
and the public.

Furthermore, two of the designated open spaces identified
by Maxson as alternative sites are in close proximity to the
community soccer fields and have an unobstructed view of those
fields.  Given that one of the reasons cited by the Planning
Board for denying Varsity's application was the visual impact of
the tower on the soccer fields and the historic agricultural
landscape nearby, it is highly unlikely that the Planning Board
would approve those sites for a communications facility.  In
fact, Maxson noted in one of his reports that a tower located on
a property near the soccer fields would not likely be
"materially less visually obtrusive than the proposed facility".

Finally, the proposed use of open spaces as alternative
sites for the Proposed Facility is even more dubious given the
provision of the Bylaw providing that

> [w]ireless service facilities shall not be located
> within open areas that are visible from public roads,
> recreational areas or residential development.

It is unclear how Maxson concluded that Town-designated open
areas are not expressly prohibited by the Bylaw in light of that
provision.  Even if those areas are not expressly prohibited,
the totality of the evidence indicates that they are unlikely to
be available for Varsity's intended use and thus are not
feasible alternatives.

As noted above, the experts of both Varsity and the Planning Board agree that C-RANs, alone, are not a feasible alternative and that at least some new macro site is required to fully service the Coverage Objective.  Even if Verizon could supplement its service in the Coverage Objective using additional C-RANs along certain streets, that solution would not remedy AT&T's significant gap in coverage because it apparently has not deployed C-RANs to that area and there are insufficient utility poles present to provide adequate coverage to the whole area.

Accordingly, Varsity has demonstrated that even those technically available alternatives are so likely to be rejected that it is a waste of time even to try to pursue them, see Nextel Commc'ns, 231 F. Supp. 2d at 408, and thus it has established that the Planning Board's decision has effectively prohibited the provision of wireless services.  Varsity's motion for summary judgment as to Count II will be allowed.

### D.   Appropriate Relief

The TCA makes clear that it expects expeditious resolution of zoning disputes on the part of local authorities and courts enforcing federal limitations. See 47 U.S.C. § 332(c)(7)(B)(v). Thus, an award of injunctive relief, rather than a remand, is often the preferred method of relief.  Brehmer v. Planning Bd. of Wellfleet, 238 F.3d 117, 121 (1st Cir. 2001).  In many cases,

-29-

the proper remedy for a zoning violation is an order instructing
the local board to authorize construction of the facility. <u>Nat'l
Tower</u>, 297 F.3d at 21-22 (finding proper remedy for TCA
violations in most cases to be order instructing board to
authorize construction); <u>Town of Oyster Bay</u>, 166 F.3d at 497
(collecting cases).  On the other hand, where there has been
"good faith confusion by a board," a remand may be more
appropriate. <u>Id.</u> at 24.

In this case, an injunction is warranted.  Defendants have
not articulated any good faith confusion by the Planning Board
regarding its decision and thus to remand the case would simply
extend the litigation, contrary to the TCA's directive to the
Court to "hear and decide such action[s] on an expedited basis".
<u>T-Mobile Ne.</u>, 755 F. Supp. 2d at 293 (citing 47 U.S.C.
§ 332(c)(7)(B)(v)).

**ORDER**

For the foregoing reasons, plaintiff's motion for summary judgment (Docket No. 28) is, with respect to Count I, **DENIED**, but, with respect to Count II, **ALLOWED**.  The defendants are directed to issue the requested permits and thereby authorize the construction of the plaintiff's Proposed Facility.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 11, 2019